FORSTER, WATERBURY COMPANY, Respondent, vs. F. MAC-
KINNON MANUFACTURING COMPANY, Appellant.

*December 5, 1906—January 8, 1907.*

*Sales: Defects: Waiver: Measure of damages: Evidence.*

1. Where articles required by contract to be of a particular charac-
ter are shipped to the executory vendee as the proper kind and
received by the latter without notice being given to the vendor,
within a reasonable time thereafter, that the articles will not
be accepted as satisfying the contract, all defects discoverable
by reasonable attention to the matter are waived.

2. Where the manufacturer and seller of iron castings was to de-
liver in instalments, and after two shipments the buyers made
complaint of defects, and in order to remedy such defects the
patterns were changed and improved, and thereafter shipments
were regularly made during an interval of about six months
without definite notice of defects until after all shipments were
substantially completed, the court is warranted in holding as
matter of law that such defects, as to the castings made after
the patterns were improved, were waived.

3. In such case, under the evidence, stated in the opinion, the al-
leged defects are *held* not to be so serious as to render the cast-
ings not good and suitable within the calls of the contract un-
der which they were furnished.

4. In an action for the contract price of iron castings of certain re-
quired strength, it is not necessary for defendant, in order to
enable it to recover for the failure of unused castings to come
up to the contract requirements, to prove the amount of defec-
tives, or the diminished value of the castings by reason thereof,
with the certainty of a demonstration. All that is required is
that such matters be established with reasonable certainty.

5. In an action for the contract price of iron castings required to
be of certain strength, defendant counterclaimed for loss occa-

sioned by the failure of unused castings to come up to the contract requirements. It appeared, among other things, that the castings used, or attempted to be used, were fairly representative of the character of those that remained, and that about twenty per cent. of the castings used had latent defects causing them to break under the pressure required in their use and were wholly useless except for scrap iron. *Held:*

(1) In the absence of any affirmative evidence to the contrary, it was inferable, with sufficient certainty to sustain a finding, that the same proportion of those not used were likewise defective.

(2) A legitimate basis was established for estimating damages as to the castings not used.

(3) Defendant was entitled to recover the amount per pound the evidence showed to be the difference in value between the castings furnished and those called for by the contract requirements.

APPEAL from a judgment of the circuit court for Wood county: CHAS. M. WEBB, Circuit Judge. *Reversed.*

Action to recover on a sale contract between plaintiff as seller and the defendant as purchaser, the terms of which were as follows:

"To.........The *F. MacKinnon Mfg. Co.:*

"Quantity....40 tons malleable castings.

Patterns to be furnished by buyer. Castings to be good and suitable quality for hub bands. Buyer to have the privilege of returning any imperfect castings.

"Price.......5¼c per pound in carload lots on cars, Centralia, Wisconsin.

"Terms......Freight cash, to be paid by buyer, balance cash thirty days from invoice date.

"Settlement other than net cash at Chicago, or by Chicago or New York draft, must include exchange. Notes must be for net amount, including interest and collection charges. All settlements must be made within thirty days from invoice date, unless otherwise specified.

"Shipments to be Made—One car about Jan. 1st, 1900. Balance prior to July 1st, 1900.

"Via C., M. & St. P. Ry.

"Freight Rate.

"In case of accident or other cause, causing the stoppage or partial stoppage of the works of either the sellers or buyers, the deliveries herein contracted for may be suspended, or at the option of the party not in default may be canceled during the continuance of said interruption. Such suspension or cancellation shall not invalidate the remainder of the contract, but on the removal of the cause of the interruption the deliveries shall be continued at the specified rate, and if the overdue deliveries shall not have been canceled they shall be made then at the regular rate, commencing when the contract would otherwise have ended.

"FORSTER, WATERBURY & Co."

There was a preliminary memorandum in respect to the matter in the following words:

"Centralia, Wisconsin,
"November 20th, 1899.

*"Forster, Waterbury & Co.,*
"358 Dearborn St.,
"Chicago, Ill.

"Memo. of agreement between the *F. MacKinnon Mfg. Co.* and *Forster, Waterbury & Co.* That the *F. MacKinnon Mfg. Co.* do contract with *Forster, Waterbury & Co.* for forty tons of malleable castings, at $5\frac{1}{4}$c per pound, in car lots, f. o. b. Centralia. Terms thirty days. The malleables to be suitable for the purposes required, and to be tough enough to stand the hydraulic pressure required of them. All defective malleable to be returned.

"THE F. MACKINNON MFG. Co.,
"F. MacKinnon, Secy."

The final contract embodied the provisions before indicated. Soon after deliveries commenced the defendant complained that the malleables were defective, in that the dove-tailed slots in the rims of the castings were more or less filled up and the castings were so brittle that many of them broke under the necessary pressure applied to place them on the wooden centers of the hubs. The malleables were intended for use as part of the make-up of wagon hubs. Complaints as to the defective character of the malleables continued from

time to time as deliveries were made and the castings were tested, and finally before the contract was wholly filled defendant rescinded it and refused to take any more of the castings. Subsequently this action was commenced to recover an alleged balance due of $776.44. The issues tendered by the complaint sufficiently appear by the summary of the findings hereafter given.

The defendant answered, among other things, counterclaiming for $3,163.80 for damages on account of the castings not being according to contract. The allegations of the counterclaim were duly put in issue, and all issues were referred to a referee to hear, try, and determine with this result: (1) The contract between the parties was as indicated in the foregoing. (2) The meaning of the term "castings to be good and suitable quality for hub bands," as the parties understood it, was the same as the idea contained in the preliminary memorandum by the words "the malleables to be suitable for the purposes required, and to be tough enough to stand the hydraulic pressure required of them," and plaintiff knew the manner of placing the malleables on the wooden hubs and all requirements in that regard. (3) Plaintiff delivered to the defendant castings of the value at the contract price of $3,959.17, and did work on patterns and paid for freight chargeable to the defendant to the amount of $233.75, making a total of its charges of $4,192.93. (4) The plaintiff claimed $5.70, freight on defective castings returned, and $98.86 for 1,883 pounds of castings shipped August 6, 1900. The former is disallowed because the castings were returned under the contract; the latter was allowed because the defendant included it in its statement to the plaintiff showing the amount of its credits and remitted the balance thus shown to be due. (5) The true amount of plaintiff's credit is $4,187.23. (6) Defendant is entitled to credit for freight paid $177.76, for shortage and defective castings $116.97, one cent per pound as per settlement on account of

labor on the first shipment of castings to render them fit for use, making $49.59, and for cash paid from time to time $3,279.74, making a total of $3,624.06, and leaving a balance due plaintiff, exclusive of defendant's counterclaim, of $563.17. (7) The defendant's claim for damages on account of defective malleables not used is disallowed, because it is in a great part guesswork; not sufficiently proved and, in effect, an attempt to relieve defendant from the dead stock of castings left over after an unsuccessful experiment with a patented article. The claim as to costs of repairing and extra cost of putting in tie plates in castings used not included in the first shipment is disallowed, because no complaint was made in the correspondence between the parties after defendant's patterns were perfected, and because the witnesses testified that no more work was done on malleables furnished by plaintiff than on those made by other manufacturers. The claim for one-half cent per pound on castings used is not satisfactorily supported by evidence and appears to have been an after-consideration to help defendant out as to dead stock. (8) Defendant is entitled to credit for 5,312 pounds of defective castings, to the amount of $258.66, and a further credit, on account of 397 defective castings weighing 2,314 pounds, of $114.65, and a further credit of $156.80 for hubs destroyed by reason of the defective castings. (9) The total allowed on the counterclaim is $530.11, leaving a balance due the plaintiff of $33.06.

Upon a hearing before the court the findings of the referee were modified by allowing defendant an additional credit for shortage in castings and culls of $25.20, leaving the balance due plaintiff $7.86, and as so modified were confirmed and judgment was rendered accordingly.

No complaint was made by the plaintiff of the conclusions reached by the referee or the circuit court. Defendant duly preserved for review upon appeal the questions discussed in the opinion.

For the appellant there was a brief by *Goggins & Brazeau,* and oral argument by *B. R. Goggins.*

*W. E. Wheelan,* for the respondent.

MARSHALL, J.  Appellant makes the following claims: (1) The court should not have allowed respondent the $98.86 for 1,883 pounds of castings shipped August 6, 1900. (2) There should have been allowed appellant an additional credit on its counterclaim of $255.38 for extra cost of putting in tie plates, occasioned by defective dove-tailed slots and brittleness of malleables.    (3) An additional amount of $411.38 should have been allowed on the counterclaim for defective quality of the unused castings on account of their not being properly annealed and not manufactured so as to avoid the defects called cold-shuts.  (4) An additional amount of $169.65 should have been allowed on the counterclaim on account of expense of working off defective stock at reduced prices.    (5) A further sum of $156.80 should have been allowed on the counterclaim on account of hub cores that would be destroyed in using the balance of the castings.

At the outset it is suggested that some improper evidence was received from a witness produced by respondent, but as it is not claimed that such evidence affected the result and counsel fail to do more than merely make the suggestion that such evidence can be found in the record, we pass the subject without further notice.

As to the $98.86 claimed to have been erroneously allowed respondent, we cannot agree with appellant.  It appears, as the referee found, that the item was included by appellant in a statement rendered in the usual way; not as a matter of compromise and settlement, so far as we can see.  Moreover, the statement and a check accompanying it covering the balance therein admitted to be due was not thereafter treated as a settlement by either party.

The effect of the decision in the court below as to imper-

fections in the castings, as regards the dove-tailed slots, is that they were not sufficiently serious to render the castings not good and suitable for hub bands, within the meaning of the contract, and further, that seasonable complaint was not made in regard thereto as to castings shipped after defects in appellant's patterns were remedied. Reference to the correspondence between the parties fails to convince us that any such complaint was made after February 16, 1900, which accords with the court's findings. Counsel for appellant suggest that there was evidence of such complaints, made verbally, in April, July, and September. By far the greater part of the shipments were made after February 16th. There was no shipment after June 29th, except the small amount covered by the item of $98.96. Furthermore, we do not find that any definite verbal complaint as to this branch of the subject was made in April, 1900. On the whole it is considered that the evidence fairly bears out the finding. It tends to prove that the patterns furnished by respondent at first, were defective in respect to the feature designed to make perfect dove-tailed slots; that such defect was removed by respondent at the latter's request and expense; that no verbal complaint was thereafter made informing respondent that castings would not be accepted as satisfying the contract because of defective dove-tailed slots till a considerable length of time after substantially all the shipments were made, and that no such complaint was made thereafter by letter, though complaints were made as to the castings being too brittle. In the letter written June 13, 1900, in which appellant finally rescinded the contract because the malleables were unsatisfactory, no mention was made of defective dove-tailed slots. The complaint was confined to the castings being too brittle and weak.

The rule is familiar that when an article required by contract to be of particular character is shipped to the executory vendee as of the proper kind and is received by the latter without notice being given to the vendor within reasonable

time thereafter that the article will not be accepted as satisfy-
ing the contract, all defects discoverable by reasonable atten-
tion to the matter are waived. *Locke v. Williamson,* 40 Wis.
377; *Northern S. Co. v. Wangard,* 117 Wis. 624, 94 N. W.
785; *H. McCormick L. Co. v. Winans,* 126 Wis. 649, 105 N.
W. 945; *Waupaca E. L. & R. Co. v. Milwaukee E. R. & L.
Co.* 112 Wis. 469, 88 N. W. 308. The rule in that regard
was stated in the last case cited, thus:

"If a person sells another property to be delivered, accom-
panying the sale with a warranty, and when delivery takes
place there are defects in the property which are discoverable
by a person of ordinary intelligence in the circumstances of
the purchaser, by the exercise of ordinary care, and such
other nevertheless accepts the property, neither objecting
thereto then nor within a reasonable time thereafter, he
thereby waives the defects so that he can neither rescind the
same, counterclaim for damages when sued for the purchase
price, nor sue for damages for breach of warranty after pay-
ing for the property."

Defects of the character under consideration would be vis-
ible upon the most casual inspection, and from the circum-
stance that such defects had been noticed from the start and
the patterns were perfected after the first shipments to avoid
the difficulty, appellant had good reason to pay attention
to that particular matter as subsequent shipments arrived and
to seasonably notify respondent if the castings made from the
improved pattern were not satisfactory in that regard. Two
shipments were made prior to February 10, 1900. On that
day respondent was by letter notified that the dove-tailed slots
were imperfect. The next shipment was made February 12,
1900; plainly of castings prepared before the letter of Febru-
ary 10th. Shipments were made thereafter, from time to
time, up to August 6, 1900, all except the 1,883 pounds
aforesaid being, as indicated, sent by June 29, 1900, and by
far the greater part before June 1, 1900. Such being the
case, in the absence of evidence of any definite notice having
been given to respondent as to defective dove-tailed slots

after February 16, 1900, till a considerable length of time after the shipments were substantially completed, the court was warranted in holding as matter of law that such defects, as to the castings made after the patterns were improved, were waived. On that ground as well as on the ground that the dove-tailed slots were not so seriously defective as to render the castings not good and suitable for hub bands, within the meaning of the contract, the disallowance of this branch of the case should not be disturbed.

The remaining question to be considered is: Were the castings not used and not obviously defective upon inspection, amounting to about 42,412 pounds, shown to be worth less than such as were contracted for because of their not being strong enough to stand the strain required to place them on the wooden hub cores, with sufficient certainty to entitle appellant to an allowance on its counterclaim on that account? The decision in the court below is that the evidence in that respect is not sufficiently convincing to remove the truth of the matter beyond mere conjecture. The items of appellant's claim for damages involved in this question are (a) the contract price, being $411.38, of the same percentage of the unused castings, not defective on their face, as proved wholly worthless as to those that were attempted to be put to use, less the value for scrap iron; (b) the value of the small percentage of wooden hub cores required in using the balance of the castings as past experience shows would probably be destroyed, being $156.80; and (c) cost of working off the stock, estimated at $169.65, making a total of $737.83. These claims should be considered as one, since the proper measure of damages, in case of a recovery, is the difference between the actual value of the castings and the value if they had been according to the requirements of the contract. *Aultman & T. Co. v. Hetherington,* 42 Wis. 622; *J. I. Case P. Works v. Niles & S. Co.* 90 Wis. 590, 63 N. W. 1013; *Park v. Richardson & B. Co.* 91 Wis. 189, 64 N. W. 859.

The evidence is undisputed that the castings were neces-

sarily subjected to great pressure in placing them on the wooden hub cores, and that in order for them to withstand it proper annealing and absence of defects called cold-shuts were necessary. Failure to so anneal the castings would leave them brittle and liable to break under the pressure, and cold-shuts would cause them to part at the sides because of the imperfect uniting of the iron on the lines of contact of the molten metal as the streams thereof flowing into the several gates, or openings, in the mould came to the blending points.

The court having found, partly as matter of fact and partly by way of construction, that the contract as understood by both parties was made with reference to a sale and purchase of castings of sufficient strength to withstand the pressure required in placing them on the wooden hub cores, such pressure being for ordinary hubs about thirty tons, as shown by the evidence, and found as matter of fact in appellant's favor on its defense and counterclaim as to all castings shown by actual test not to be up to the requirement, and respondent having failed to except to any of the conclusions in that regard, it stands as a verity in the case that appellant is entitled to recover on its counterclaim for the diminished value of the unused castings on account of their not being up to such requirement, if such diminished value be established by the evidence with sufficient certainty to permit of an assessment of damages being made.

By reason of the state of the case referred to, unexcepted to by respondent, there is no question of implied warranty nor any as to whether allowances were improperly made by the trial court, for failure of castings actually tested to come up to the required strength, that we need consider. Some such questions are discussed in respondent's brief, but may well be passed without further mention.

To enable appellant to recover for failure of the unused castings to come up to the contract requirements as to strength, it was not necessary to prove the amount of the de-

fectives nor the diminished value of the castings by reason thereof, with the certainty of a demonstration. All that was required was to establish such matters to a reasonable certainty. If more was required in judicially assessing damages many wrongs would go unrighted. It is familiar law that even loss of opportunity to make profits in a business is a proper subject for compensation in damages by the person producing such loss, and that proof of profits derived from such business covering a considerable period of operations furnishes a legitimate basis for determining the compensation recoverable for profits prevented through a discontinuance thereof produced by breach of contract. *Shepard v. Milwaukee G. L. Co.* 15 Wis. 318; *Treat v. Hiles,* 81 Wis. 280, 50 N. W. 896; *Kelley, M. & Co. v. La Crosse C. Co.* 120 Wis. 84, 90, 97 N. W. 674.

In the last case cited the court said:

"Only when the estimation of prospective profits involves such degree of speculation and uncertainty that it is likely to work injustice, rather than justice, should courts reject it if loss of profits is the result of the breach of the contract. . . . Past experience may establish with sufficient certainty what would have been the course and results of that business during a certain period of interruption" for the recovery of damages.

Applying the foregoing principle to the situation before us it would seem that if the evidence in this case shows that the 30,000 pounds of castings used, or attempted to be used, were fairly representative of the character of those that remained, then a legitimate basis was established for estimating damages as to the latter. As we read the record that was shown. The evidence quite satisfactorily proves that from the time appellant commenced using the castings till the last of the 30,000 pounds was handled a large percentage proved to be not up to the contract strength by reason of improper annealing and cold-shuts; that about twenty per cent. of the castings had latent defects causing them to break under the

pressure required to be put upon them and were wholly use-
less except for scrap iron. It does not seem necessary to refer
to the evidence in detail on this subject. Since the defective
character of the castings as to so large a quantity, including
a number of invoices, was demonstrated by actual test, in
the absence of any affirmative evidence to the contrary it is
inferable, with sufficient certainty to sustain a finding as to
the character of those that were not used, that they were like-
wise defective. To so conclude would not be indulging in
mere guesswork, but in a fairly logical process of reasoning,
similar to that by which past experience as to profits in a
business forms a legitimate basis for determining prospective
profits. In any case of the accumulation of a large quantity
of manufactured articles, all of the same general kind, made
at the same factory and from the same patterns or designs
and a large proportion thereof proving defective in certain
particulars, one would naturally conclude, in the absence of
evidence to the contrary, that the balance of the lot is like-
wise defective. We are constrained to hold that a mistake
was made on this branch of the case; that too high a standard
of certainty as to the establishment of facts was held to be
necessary in order to enable a finding to be made on the sub-
ject of damages. In many situations compensation for loss,
wrongfully produced, is recoverable where neither the loss
generally nor the amount of it can be established except to a
reasonable certainty.

The quantity of the unused castings, as before indicated,
as appears without substantial dispute, if any, was 42,212
pounds. The only direct evidence in the record as to the
diminished value of such castings from the contract require-
ments on account of their being brittle and defective because
of cold-shuts, places such diminished value at one and one-
half cents per pound. That was corroborated by evidence as
to the percentage that would probably break in placing the
castings on hub cores, and extra cost of using them because of

their weakness.   It seems that from the whole evidence the
difference between the value of such castings as were con-
tracted for and such as were furnished because of the con-
tract requirements as to strength not being satisfied, is fairly
measured by one and one-half cents per pound, or $638.18
for the unused stock.   That entitles appellant to judgment
against the plaintiff for $628.32 and interest from the time
the counterclaim was interposed, to wit, January 10, 1903.

*By the Court.*—The judgment is reversed, and the cause
remanded with directions to render judgment in favor of the
defendant for $628.32 and interest from January 10, 1903,
with costs.